UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
FREDDIE PIERRELOUIS, a minor under 14
years of age by his Father and Natural
Guardian, EDDY PIERRELOUIS, and EDDY
PIERRELOUIS, Individually,

          Plaintiffs,

    -against-                        08 Civ. 123 (KTD)

ESTHER BEKRITSKY, M.D., GERSON GLUCK,
M.D., GAVIN JOFFE, M.D., ERIC SILVA,    MEMORANDUM & ORDER
M.D., FE MURPHY, M.D., MONSEY FAMILY
MEDICAL CENTER, and GOOD SAMARITAN
HOSPITAL MEDICAL CENTER,

          Defendants.

------------------------------------X

KEVIN THOMAS DUFFY, U.S.D.J.:

On June 27, 2012, a jury returned a verdict in favor of Plaintiff Freddie Pierrelouis in his medical malpractice and vicarious liability claims against Eric Silva, M.D., and Defendant Good Samaritan Hospital Medical Center ("Good Samaritan"). It awarded $750,000 in damages, 15% of which the jury allocated to Dr. Silva and 85% of which the jury allocated to Good Samaritan. Good Samaritan now moves this court pursuant to Federal Rules of Civil Procedure ("FRCP") 59 and 50 to set aside the jury verdict and order a new trial or, in the alternative, to direct judgment in favor of Good Samaritan. For the following reasons, Good Samaritan's motion is DENIED.

I.  Background

    A.  Factual Background

On April 19, 2002, Plaintiff Eddy Pierrelouis brought his son, Plaintiff Freddie Pierrelouis (collectively, "Plaintiffs"), who was six weeks old at the time and had a fever, to the emergency department of Good Samaritan after being telephonically instructed to do so by Defendant Esther Bekritsky, M.D.,[1] of Defendant Monsey Family Medical Center ("Monsey"). Freddie was seen by Dr. Silva, an emergency room doctor at Good Samaritan employed by Rockland Emergency, an independent contractor of emergency services to Good Samaritan. Various tests were performed, including a complete blood count ("CBC") with differential and a blood culture. Urinalysis and a lumbar puncture were not performed. The CBC showed that Freddie's immature white blood cell count, or band count, was at 32. With these results in hand, Dr. Silva telephonically consulted Defendants Gavin Joffe, M.D., and Gerson Gluck, M.D., of Monsey about Freddie's diagnosis and a course of action. A follow-up appointment for Freddie was scheduled with Dr. Joffe at Monsey for April 21, 2002. Dr. Silva noted on Freddie's chart that he had a viral syndrome and discharged him with an

---

[1] Dr. Bekritsky was dismissed from the present action on December 19, 2011.

2

instruction that he should be administered Tylenol. Freddie did not receive any antibiotics.

At approximately 8:27 a.m. on April 20, 2002, the blood culture was reported positive for Group B Streptococcus. On April 21, 2002, Nathaniel Silverberg, M.D., an emergency room doctor at Good Samaritan employed by Rockland Emergency, called Mr. Pierrelouis. Dr. Silverberg instructed Mr. Pierrelouis to have one of Freddie's pediatricians at Monsey call the emergency department at Good Samaritan when Mr. Pierrelouis took Freddie to Monsey for his appointment later that day. At Monsey, Dr. Joffe treated Freddie, who had a high fever that morning. Dr. Joffe did not communicate with Dr. Silverberg or anyone else in the emergency department at Good Samaritan about the results of Freddie's blood culture. At approximately 4 p.m. on April 21, Dr. Silverberg contacted Mr. Pierrelouis for a second time to inform him that no Monsey doctor had yet called him regarding the results of Freddie's blood culture.

On April 24, 2002, Mr. Pierrelouis brought Freddie back to Monsey with complaints of weakness and tenderness in Freddie's right hand and arm. Dr. Joffe sent Freddie to the emergency department of Good Samaritan, where he was treated by Defendant Fe Murphy, M.D.[2] Dr. Murphy consulted with Drs. Joffe and Gluck

---

[2] Dr. Murphy was dismissed from the present action on June 14, 2002.

3

and arranged for Freddie's admission. Before being treated with antibiotics, Mr. Pierrelouis signed Freddie out of the hospital and took him to Nyack Hospital.

On April 25, 2002, Freddie was admitted to Nyack Hospital with a diagnosis of Group B streptococcal meningitis and was hospitalized for 28 days until May 22, 2002. On May 6, 2002, Freddie suffered two seizures and was placed on Phenobarbital, a seizure medication.

B.  Procedural History

Plaintiffs' amended complaint asserts four causes of action: medical malpractice, lack of informed consent, vicarious liability, and a claim on behalf of Mr. Pierrelouis as Freddie's father. During a ten-day trial, no evidence was proffered in support of Plaintiffs' claims as to lack of informed consent and as to Mr. Pierrelouis. The jury was instructed only as to Freddie's medical malpractice and vicarious liability claims and was asked to apportion fault, if any, between Drs. Silva, Joffe, Gluck, Monsey, and Good Samaritan. Good Samaritan objected to its being held vicariously liable for the actions of Dr. Silva and other doctors in its emergency department. Good Samaritan also objected to the question on the verdict sheet asking the jury to apportion fault to Good Samaritan for its vicarious liability if the jury found Dr. Silva liable.

During summation, counsel for Plaintiffs suggested that Dr. Silva repeatedly changed his deposition testimony at trial to protect Good Samaritan. Good Samaritan objected and was overruled.

Regarding damages for pain and suffering, the court explained during its charge to the jury that:

> [A p]revailing plaintiff in this type of action . . . may be entitled to damages for emotional pain, suffering, inconvenience, mental anguish, that is suffered as a result of the defendants' conduct, including damages for any physical consequences resulting from the emotional distress caused by the wrongful acts. In this regard, you should not award damages for speculative injuries, but only for those that plaintiff actually suffered as a result of the defendants' conduct, or which the plaintiff is reasonably likely to suffer in the near future. You should take into consideration the period of time that the injuries or disabilities are expected to continue.
> You must also consider whether and to what extent the plaintiff's emotional anguish has been due to a condition that existed prior to, or arose from[,] events other than the actions of the defendants.
> In determining the amount if any to be awarded to the plaintiff for pain and suffering, you may take into consideration the effect that the plaintiff's injury has on his ability to enjoy life. Loss of [t]he enjoyment of life involves the loss of the ability to perform daily tasks or experience the pleasures of life. Keep in mind that a person suffers a loss of enjoyment of life only if that person is aware at some level of the loss that he has suffered.
> . . . Please remember, ladies and gentlemen, the amount of damage[s] in this case is entirely up to you, if you find that damages are there.

During deliberations, the jury sent a note to the court asking, "Can you give us guidance regarding quantifying pain and suffering[?]" In response to the note, the parties jointly

5

requested that the court read the jury New York Pattern Jury Instructions 2:280 and 2:280.1. The court instructed the jury as follows:

> If you decide that the defendant is liable, or a defendant is liable, plaintiff is entitled to recover a sum of money which will justly and fairly compensate him for any injury and conscious pain and suffering to date caused by the plaintiff [sic]. Conscious pain and suffering means pain and suffering of which there is some level of awareness.
> In determining the amount, if any, to be awarded plaintiff for pain and suffering, you may take into consideration the effect that plaintiff's injuries have had on the plaintiff's ability to enjoy life. Loss of enjoyment of life involves the loss of the ability to perform daily tasks, to participate in the activities which were a part of a person's life before the injury, and to experience the pleasures of life.
> However, a person suffers the loss of enjoyment of life only if the person is aware at some level of the loss that he has suffered.
> If you find that plaintiff, as a result of his injuries, suffered some loss of the ability to enjoy life and that the plaintiff was aware at some level of a loss, you may take that loss into consideration in determining the amount to be awarded to plaintiff for pain and suffering to date.
> Now, ladies and gentlemen, I wish there was an easy way of giving you some kind of a quantifying formula, but there is none. It's using your common sense along with my instructions, all right?

The jury returned a verdict for Freddie, awarding $750,000 in damages and apportioning 15% of the fault to Dr. Silva, 5% of the fault to Good Samaritan for the actions of Dr. Silva, and 80% of the fault to Good Samaritan for the actions of other employees after receipt of Freddie's blood culture results.

Monsey and the doctors associated with it were exculpated by the jury.

Good Samaritan filed a timely motion to set aside the jury verdict and order a new trial or in the alternative to direct judgment in favor of Good Samaritan. Good Samaritan argues that the jury's verdict on liability against it is not supported by the weight of the evidence and that it cannot be held vicariously liable for the actions of the non-employee doctors working in its emergency department. Good Samaritan also argues that even if vicarious liability is properly assessed against it, the jury should not have been asked to apportion fault to Good Samaritan in addition to the fault it apportioned to Dr. Silva. Good Samaritan requests a new trial on the basis that the jury's damages award is excessive and is not supported by the evidence; in the alternative, Good Samaritan asks this court to reduce the amount of damages as excessive. Finally, Good Samaritan argues that it was denied a fair trial when this court failed to give a curative instruction after Plaintiffs' counsel implied that Dr. Silva changed his testimony to protect Good Samaritan.

II. Legal Standards

Under FRCP 59, a district court "may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has

heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). A new trial is justified if the district court finds that "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice, i.e., that the verdict is against the weight of the evidence, that the damages awarded were excessive, or that for stated reasons the trial was not fair to the moving party." Mallis v. Bankers Trust Co., 717, F.2d 683, 691 (2d Cir. 1983). While the "trial judge is free to weigh the evidence himself, . . . the court should only grant [a motion for a new trial] when the jury's verdict is 'egregious.'" DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998) (citing Dunlap-McCuller v. Riese Org., 980 F.2d 153, 158 (2d Cir. 1992)).

Under FRCP 50(b), a party whose motion for a judgment as a matter of law pursuant to FRCP 50(a)(2) was denied before the case was submitted to the jury "may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). Under FRCP 50, judgment as a matter of law may only be granted where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The court is required to "'draw all reasonable inferences in favor of the

8

nonmoving party, and it may not make credibility determinations or weigh the evidence.'" New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 295 F.3d 232, 240 (2d Cir. 2002) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). "A court may not set aside a verdict unless 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" Id. (quoting This Is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998)) (alteration in original).

III. Discussion

    A.    The Jury's Verdict Was Supported by the Evidence and Good Samaritan Is Vicariously Liable for Its Emergency Room Doctors

Good Samaritan contends that because Dr. Silva and the other doctors who worked in its emergency department in April 2002 were not its employees, but rather employees of Rockland Emergency, it cannot be held vicariously liable for the actions of those doctors. Rockland Emergency was an independent contractor of emergency services to Good Samaritan and employed emergency room doctors to provide those services.

Under New York law, a hospital that "[holds] itself out to the public as an institution furnishing doctors, staff and facilities for emergency treatment[ is] under a duty to perform

9

those services and is liable for the negligent performance of those services by the doctors and staff it hired and furnished" to patients who "enter[] the hospital for hospital treatment." Mduba v. Benedictine Hosp., 384 N.Y.S.2d 527, 529 (App. Div. 3rd Dep't 1976). This duty continues to exist even if the hospital contracts out for emergency room services. "[P]atients are not bound by secret limitations as are contained in a private contract between the hospital and the doctor." Id. Plaintiffs arrived at Good Samaritan seeking emergency room services that Good Samaritan purported to provide. The fact that those services were provided by Dr. Silva, an employee of Good Samaritan's independent contractor, does not exempt Good Samaritan from liability. See Malcolm v. Mount Vernon Hosp., 766 N.Y.S.2d 185, 186 (App. Div. 1st Dep't 2003) (citing Mduba, 384 N.Y.S.2d at 529). Plaintiffs "reasonably believed that [Dr. Silva] was acting at [Good Samaritan's] behest." Id. (internal citations omitted). Similarly, Good Samaritan cannot escape liability simply because the results of Freddie's blood culture were communicated to "non-employee emergency room physician Dr. Silverberg." Mr. Pierrelouis "reasonably believed that [Dr. Silverberg, another Good Samaritan emergency room doctor,] was acting at [Good Samaritan's] behest." Id.

The hospital's liability for the actions of its emergency room doctors was a question of fact properly submitted to the

jury. See Braun v. Millard Fillmore Suburban Hosp., 473 N.Y.S.2d 627, 628 (App. Div. 4th Dep't 1984). Evidence adduced at trial showed that Dr. Silva wore an identification badge identifying him as a Good Samaritan doctor and that Freddie did not arrive at Good Samaritan accompanied by his own doctors, nor did Mr. Pierrelouis seek out a specific doctor at Good Samaritan to treat Freddie. The jury therefore had a rational and legally sufficient evidentiary basis on which to conclude that Good Samaritan was liable for the actions of Dr. Silva and other doctors working in its emergency department and to render a verdict accordingly.

    B.    The Jury's Apportionment of Fault Was Inconsistent with Vicarious Liability Theory But a New Trial Is Unnecessary Because All Liability Flows to Good Samaritan in the End

While the jury appropriately found Good Samaritan liable for Dr. Silva's actions in April 2002, it should not have been asked to apportion a percentage of the total fault to that liability. No evidence was offered at trial to show that Good Samaritan was directly liable to Freddie for the events of April 2002. Indeed, a hospital's liability "for the acts of independent physicians where a patient enters the hospital through the emergency room and seeks treatment from the hospital, not from a particular physician[,]" is vicarious in nature. Shafran v. St. Vincent's Hosp. & Med. Ctr., 694

N.Y.S.2d 642, 646 (App. Div. 1st Dep't 1999). Where "the record does not support the finding of any active negligence" as to a defendant and liability is therefore vicarious only, a jury's allocation of fault to that defendant is improper. Wagner v. Grinnell Hous. Dev. Fund Corp., 746 N.Y.S.2d 156, 157 (App. Div. 1st Dep't 2002); see also Salamone v. Wincaf Props., Inc., 671 N.Y.S.2d 737, 738 (App. Div. 1st Dep't 1998); La Barge v. Griffin Pipe Prods. Co., 565 N.Y.S.2d 939, 940 (App. Div. 4th Dep't 1991). A jury may only apportion liability "upon the basis of the negligence or culpable conduct of the parties." La Barge, 565 N.Y.S.2d at 941.

The exception lies where those with primary liability are not parties to the action. See Trivedi v. Golub, 847 N.Y.S.2d 211, 212 (App. Div. 2d Dep't 2007) ("In an action against an employer based upon the doctrine of respondeat superior, the employee allegedly committing the tortious conduct is not a necessary party." (internal citations omitted)). Vicarious liability can be imposed against a defendant even though the plaintiff has not also brought suit against those individuals whose tortious actions give rise to that liability. Id. In such a case, any fault which the jury would have allocated to the tortious actor is appropriately allocated to the defendant who is vicariously liable for that actor instead.

12

In this case, the 5% of fault the jury apportioned to Good Samaritan for Dr. Silva's actions was necessarily predicated on Good Samaritan's vicarious liability. See, e.g., La Barge, 565 N.Y.S.2d at 940. Good Samaritan is vicariously liable for the 15% of fault that the jury attributed to Dr. Silva, and without any proof of direct liability, the additional 5% of fault attributed to Good Samaritan alone for Dr. Silva's actions is "inconsistent with the theory of respondeat superior." Rodick v. City of Schenectady, 1 F.3d 1341, 1348 (2d Cir. 1993). On the other hand, the jury's 80% allocation of fault to Good Samaritan for the actions of other doctors, who are not parties to this action, is tenable. The court construes the jury's 80% allocation of fault to Good Samaritan for the actions of other doctors after receipt of Freddie's blood culture results as an allocation of fault to the other doctors for whom Good Samaritan is vicariously liable.

The typical remedy for a misallocation of fault to a defendant whose liability is solely vicarious in nature is a new trial to reallocate liability between the actively negligent and culpable defendants. See, e.g., Salamone, 671 N.Y.S.2d at 738; La Barge, 565 N.Y.S.2d at 941. In this case, however, a new trial is unnecessary because Good Samaritan is vicariously

liable for all of the doctors the jury found liable,[3] namely Dr. Silva and the Good Samaritan emergency room doctors following receipt of Freddie's blood culture results. Since all fault in this case, regardless of whether it is apportioned to Dr. Silva or to the other Good Samaritan emergency room doctors, flows to Good Samaritan because it held itself out as providing emergency room services, a new trial would be superfluous.

    C.    Good Samaritan Did Not Object to the Court's Instructions as to Damages

Good Samaritan submits that the jury's verdict of $750,000 in damages is excessive. It argues that the jury's verdict is not specific as to which portion of the damages is attributable to Freddie's past pain and suffering as compared to his future pain and suffering. However, Good Samaritan neither objected to the court's original instructions as to damages for pain and suffering nor did it object to the court's instructions in response to the jury's note asking how to quantify damages for pain and suffering. The parties agreed to the instructions that the court read to the jury in response to its note. Good Samaritan did not ask the court to give a more specific instruction as to the quantification of damages for pain and

---

[3] Neither Dr. Silva nor any other entity with an interest moved to set aside the jury's verdict or to direct judgment in its favor.

suffering. Good Samaritan also failed to object to the damages question as it was posed to the jury on the verdict sheet.

Under FRCP 51, objections to the jury charge and interrogatories on the verdict sheet are properly made "before the jury retires to deliberate." Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 61 (2d Cir. 2002). Failure to timely object results in waiver of the objection. See Jarvis v. Ford Motor Co., 283 F.3d 33, 57 (2d Cir. 2002). Where waiver has occurred, the court may only review its jury instructions and verdict sheet for "fundamental error," which must be "'so serious and flagrant that it goes to the very integrity of the trial.'" Fashion Boutique, 314 F.3d at 61 (quoting Shade v. Hous. Auth. of New Haven, 251 F.3d 307, 312 (2d Cir. 2001)); see also Jarvis, 283 F.3d at 62. The Second Circuit has found fundamental error when "the jury charge 'deprived the jury of adequate legal guidance to reach a rational decision.'" Jarvis, 283 F.3d at 62 (quoting Werbungs v. Collectors' Guild, Ltd., 930 F.2d 1021, 1026 (2d Cir. 1991)).

Here, Good Samaritan failed to object to the court's instructions as to damages for pain and suffering and the damages question on the verdict sheet. Good Samaritan thereby waived its objections to those issues. No fundamental error exists because the court outlined various factors the jury could consider when evaluating what, if any, damages to award and

15

because the jury issued a verdict that "comport[ed] with the trial court's instructions." Lavoie v. Pac. Press & Shear Co., 975 F.2d 48, 55 (2d Cir. 1992).

>   D.  Plaintiffs' Counsel's Comment on Summation Was Not Improper

Good Samaritan asserts that counsel for Plaintiffs improperly implied that Dr. Silva lied during his testimony at trial and thereby denied Good Samaritan a fair trial. Counsel for Plaintiffs suggested during summation that "Dr. Silva changed his mind every time a lawyer in this room asked him a question. And I submit to you[,] I believe it was to try to protect Good Samaritan Hospital as a result of being a former employee." These statements were not improper. Statements made during summation are "not statements of the evidence at all, but [a]re rather argument calling on the jury to draw inferences from the evidence." Marcic v. Reinauer Transp. Cos., 397 F.3d 120, 126 (2d Cir. 2005); see also United States v. Arboleda, 20 F.3d 58, 61 (2d Cir. 1994). "A district court is entitled to give attorneys wide latitude in formulating their arguments." Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d 253, 271 (2d Cir. 1999). The court overruled Good Samaritan's objection and did not give a curative instruction, but it did instruct the jury following the attorneys' closing arguments that:

> Now, you have heard the summations of counsel.
> If you believe counsel has stated something as a fact

16

> as to which there is no evidence, disregard that part
> of what he or she said. Arguments of counsel on the
> law or anything which has no bearing on the relevant
> issues have no place in this case and you are to
> ignore them completely.
> Counsel may, however, properly argue to you on
> the evidence or lack of evidence . . . . Remember,
> however, statements of counsel, particularly in
> argument, are not evidence and you are not to view
> them as anything more than arguments of advocates.
> They are not evidence.

Given the presumption that "a jury follows the instructions of the court," United States v. Batista, 684 F.3d 333, 342 (2d Cir. 2012), the statement by Plaintiffs' counsel was not so prejudicial and unfair as to require a new trial. See, e.g., United States v. Faisal, 282 F. App'x 849, 851 (2d Cir. 2008) ("[W]hile the district court did not give a curative instruction expressly addressing [defendant's] objection, it properly instructed the jury that the parties' summations were not evidence.").

IV. Conclusion

For the foregoing reasons, Good Samaritan's motion is DENIED.

SO ORDERED.

Dated:   New York, N.Y.
         December 2̲1̲, 2012

/s/ Kevin Thomas Duffy
KEVIN THOMAS DUFFY, U.S.D.J.

17